**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **HAZEL CONNER AND** | § | |
| **SYTHERIA TUCKER,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-03-54** |
| | § | |
| **CELANESE, LTD.** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM & ORDER**

Pending before is Defendant Celanese, Ltd.'s Motion for Summary Judgment (Dkt. #63). Upon consideration of the motion, the response, and the applicable law, the Court is of the opinion that the motion should be granted in part and denied in part.

**Factual and Procedural Background**

Plaintiff Hazel Conner ("Conner") was employed as a Lab Analyst at Defendant's facility in Bay City, Texas, beginning in May of 1977. She held the position of Top Analyst as of 1980 and retired on February 1, 2005. Plaintiff Sytheria Tucker ("Tucker")[1] was hired to work at the Bay City facility in November 1989. She was promoted to the position of Top Analyst in 1993.

At the request of its hourly workers, in the mid 1980's Defendant experimented with placing some of its Bay City employees on 12-hour shifts instead of 8-hour rotating shifts. The employees were allowed to vote on whether to make the change to the 12-hour shift.

A number of the facts in this case are disputed. According to the Defendant, prior to voting on implementation of the 12-hour shift system, employees were provided detailed information

---

[1] Conner and Tucker may be referred to collectively as "Plaintiffs" throughout this Memorandum & Order.

packets specifying how the 12-hour shift would be implemented as well as a list of the advantages and disadvantages of changing to a 12-hour shift system. This packet specifically informs Defendant's employees that the 12-hour shift system would only be implemented if it was cost-neutral to Defendant, meaning that the employees' annualized wages would not change. In other words, the packet informs employees that the new system would not result in a pay raise or pay reduction to the employees. The packet informs Defendant's employees that their hourly wage rates would be adjusted when the change to the 12-hour shifts occurred, in order to ensure that the change would remain cost-neutral.

Defendant also asserts that it informed its employees that those working 12-hour shifts would be paid a 12-hour rate of pay that was lower than the hourly rate the employees were paid for working 8-hour shifts (i.e., "the 8-hour rate"). To reach the new 12-hour rate of pay, Defendant multiplied the 8-hour rate by a factor of .857. Defendant asserts that this 12-hour rate became the "regular" rate of pay for employees working 12-hour shifts. Employees working 12-hour shifts were to be paid the regular 12-hour rate of pay for the first eight hours of each shift, then one and one-half times the regular 12-hour rate for the last four hours of each shift. Thus, Defendant paid its employees overtime rates for any work over eight hours a day, although the statute only requires employers to pay time and a half for any work over 40 hours in a work week.

The .857 adjustment factor to the 8-hour rate ensured that the employees' annualized wages remained the same when they made the switch to the 12-hour shifts. A written explanation of this adjustment factor, with sample calculations, was included in the information packet which was allegedly provided to the employees when they voted on implementation of the 12-hour system on a permanent basis.

Plaintiffs deny ever being told that they were going to be paid at an hourly rate less than their posted wage rates before December 4, 2003.[2]  Plaintiffs also maintain that they never received or were shown a copy of Defendant's pay formula.  However, Plaintiffs do not dispute that they were made available for their review.

The employees ultimately voted in favor of the 12-hour system by a two-thirds majority. Conner voted in favor of the change to 12-hour shifts.  Defendant implemented the 12-hour rotating shift system in January 1987.  Employees choosing to work 8-hour shifts continued to be paid the 8-hour rate and employees such as Conner, that changed to 12-hour shifts were paid the 12-hour rate.

After the implementation of the 12-hour system, Defendant had both an 8-hour and a 12-hour rate of pay.  The rates and the explanation of the 12-hour rate were included in Defendant's pay policy, which was put into effect in 1987 and then also in subsequent pay policies in 1995 and 1999. Plaintiffs maintain that they were never shown the 1995 or 1999 pay policies.[3]

To facilitate the implementation of the 12-hour shift system, Defendant formed a Quality Assurance Team ("QAT") that was charged with answering employees' questions regarding the 12-hour system and the new pay scheme.  Conner was a member of the QAT.  Defendant asserts that, as a member, it was Conner's responsibility to explain the shift change to other employees.  Conner asserts that it was never her responsibility to explain the shift change, the 12-hour pay policy, or the pay formula.  She maintains that she did not even understand this policy herself.[4]

Tucker was not employed by Defendant at the time of the change to the 12-hour shifts.  She

---

[2] *See* Pls.' Exs. 3 & 4, Aff. of Sytheria Tucker and Hazel Conner.

[3] *Id.*

[4] Pl.'s Ex. 4, Aff. of Hazel Conner.

3

originally worked as a security guard and then as a helper in the shipping department, both 8-hour shift positions for which she was paid the 8-hour rate. Later she worked as an operator and was transferred to a 12-hour shift, and was paid the 12-hour rate. Conner was paid the 12-hour rate for 16 years and Tucker was paid the 12-hour rate for 12 years. Both Plaintiffs filled out time sheets for each pay period designating by pay code the rates they were to be paid for each shift. Plaintiffs assert that they were never shown any documents which differentiated between their posted wage rate and Defendant's calculated wage rate.

### Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). An issue is "material" if its resolution could affect the outcome of the action. *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 347 (2001).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id*. at 322. If the moving party fails to meet this burden, then they are not entitled to a summary judgment and no defense to the motion is required. *Id.*

4

"For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718-19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323-25. To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Yaquinto v. Segerstrom (In re Segerstrom)*, 247 F.3d 218, 223 (5th Cir. 2001); *see also Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence, disregard all evidence favorable to the moving party that the jury is not required to believe, and give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Willis v. Moore Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## Discussion

Plaintiffs brought the instant lawsuit against the Defendant on May 15, 2003. Plaintiffs allege that Defendant breached their employment contract under Texas law, denied them overtime pay in violation of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA"), and retaliated

5

against them in violation of the FLSA. Tucker has also asserted a claim for intentional infliction of emotional distress.[5] Defendant has moved for summary judgment on all of these claims.

## I.      Breach of Contract

Plaintiffs claim that Defendant breached their employment contract by promising to pay them a higher hourly rate than they were actually paid.

In support of its argument that it is entitled to summary judgment on Plaintiffs' breach of contract claim, Defendant makes the following arguments:

> (1)    No contract to pay the 8-hour rates existed between Defendant and Plaintiffs because
>
>> (a)    the posting of general guidelines, including rates of pay, does not amount to a contract as a matter of law; and
>>
>> (b)    there was no meeting of the minds with regard to Defendant paying Plaintiffs' the 8-hour rate.
>
> (2)    In the alternative, Plaintiffs accepted a modification of their pay rate, thereby negating their breach of contract claim as a matter of law.
>
> (3)    Alternatively, Plaintiffs' conduct precludes their breach of contract claim under the doctrine of estoppel.

The Court will address each argument in turn.

### A.      Sufficiency of Plaintiff's Breach of Contract Claim

Defendant argues that no contract existed to pay the 8-hour rate because the posting of pay rates did not amount to a contract and because there was never a meeting of the minds with regard to paying such a rate. In order to create a binding contract under Texas law, the contract must have an offer and an acceptance and the offer must be accepted in strict compliance with its terms. *Williford Energy Co. v. Submergible Cable Services, Inc.*, 895 S.W.2d 379, 384 (Tex.

---

[5] *See* Pls.' 2nd Am. Compl. ¶ 22.

App.–Amarillo 1994, no writ). The parties must also have a meeting of the minds and each must communicate his consent to the terms of the agreement. *Id.* It is not enough that the parties think they have made a contract, they must have also expressed their intentions in a manner that is capable of understanding. *See id.* (citing *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex. 1966)).

The Plaintiffs were both initially paid the 8-hour rate before they moved to the 12-hour shift system where they were paid the 12-hour rate (i.e., the "calculated rate" arrived at by multiplying their 8-hour rate by .857). Thus, there was clearly a meeting of the minds and a contract existed between the parties with respect to the 8-hour rate (i.e., the "posted rate" on the Plaintiffs' employee personnel files and those that were posted throughout the plant). That brings us to the issue of whether the contract was modified.

### B.     Modification

Under Texas law, even an at-will employee has a contract with her employer that is is "valid and subsisting" "until terminated." *See Paniagua v. City of Galveston, Tex.*, 995 F.2d 1310, 1313 (5th Cir. 1993) (holding that, under Texas law, a contract may be terminable at will and without cause but an employer cannot promise to pay employee a certain wage and then unilaterally decide to pay employee less for work she has already performed). Though employers are free to change their wage rates, they must first inform their employees before doing so. *Id.*

In the employment at will context, either the employer or the employee may impose modifications to the employment terms as a condition of continued employment. *Hathaway v. General Mills*, 711 S.W.2d 227, 229 (Tex. 1986). The party asserting the modification bears the burden of proving that the other party agreed to modify the employment terms. *Id.* When the employer notifies the employee of the change in terms, the employee must either accept the new

7

terms or quit. *Id.* An employer seeking to prove modification must show that (1) it notified the employee of the change, and (2) that the employee accepted the change. *Id.* In order to prove notice, an employer asserting a modification must prove that it unequivocally notified the employee of definite changes in employment terms. *Id.* (citing *Stowers v. Harper*, 376 S.W.2d 34, 39 (Tex. Civ. App.–Tyler 1964, writ ref'd n.r.e.)).

In their briefs, Plaintiffs and Defendant argue at some length about whether certain employee handouts and postings can qualify as employment contracts and/or modifications to employment contracts. While these issues are central to the ultimate disposition of this case, they are not relevant at the summary judgment stage. The immediate issue at bar is simply whether Defendant modified Plaintiffs' wages without Plaintiffs' knowledge. Each time Defendant modified either Plaintiff's wage with her knowledge and she thereafter accepted her paycheck, the employment contract was accordingly modified. The parties do not dispute that both Plaintiff's wages were in fact modified many times during their employment with Defendant. Plaintiffs contend through affidavits and documents that some of these modifications were never properly disclosed, specifically that the modification made to their regular hourly rate when they became 12 hour shift workers was never disclosed and therefore never became a part of their employment contract.

Conversely, Defendant states that all employees were provided with detailed information packets prior to voting on the implementation of the 12-hour shift system and that it informed its employees that those working 12-hour shifts would be paid a new 12-hour rate of pay. Despite this assertion, however, Defendant provides no evidence to support its claim that the information was actually provided or made available to employees prior to voting. Clearly, there is a significant factual dispute about the modification issue. Consequently, the Court finds that, subject to the findings on estoppel below, summary judgment is not appropriate as to the Plaintiffs' breach of contract claim.

### C.    Estoppel

Defendant argues in the alternative that even if the employment contract required the payment of the 8-hour rate and the agreement was not modified, Plaintiffs' conduct in accepting their pay at the 12-hour rates and the attendant benefits of the 12-hour shift schedule without objection for some combined 28 yearsJune 7, 2006 before initiating their lawsuit precludes their breach of contract claim under the doctrine of estoppel.

Defendant contends that, under Texas law, the theory of quasi-estoppel precludes a party from asserting rights and privileges that are inconsistent with its previous position. *See Duncan Land and Exploration, Inc. v. Littlepage*, 984 S.W.2d 318, 330 (Tex. App.–Fort Worth, 1998, pet. denied). Unlike equitable estoppel, quasi-estoppel requires no showing of false representation or detrimental reliance. *Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.–Houston [14th Dist.] 1991, no writ). However, application of the doctrine requires that the party to be estopped had knowledge of the facts surrounding the accepted benefit. *Id.*

As alleged by the Plaintiffs, they did not know that the paychecks they accepted as 12-hour shift workers were calculated at a lower rate. As discussed above, there is clearly a significant factual dispute about what Plaintiffs did or did not know or should have known about the modification to 12-hour shift wages. Therefore, the Court denies summary judgment as to Defendant's quasi-estoppel defense.

### II.    FLSA Overtime Claim

Plaintiffs contend that they are entitled to overtime pay for the weeks between May 15, 2000 and September 30, 2003 that they worked over 40 hours.[6] The Defendant has moved for summary judgment on Plaintiffs' FLSA claim on the ground that it complied with the FLSA's requirements.

---

[6] The FLSA has a three year statute of limitations for willful violations. *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261, 270-71 (5th Cir. 1987).

The FLSA requires that an employer pay its employees at least the statutory minimum wage of $5.15 per hour. *See* 29 U.S.C. § 206(a)(1). The FLSA provides a general rule that, unless exempt, any employee who works more than 40 hours in a work week must be paid one and one-half times their regular rate of pay. *See* 29 U.S.C. § 207. The regulations provide that each week stands alone for purposes of determining overtime pay. 29 C.F.R. § 778.104. In other words, with certain exceptions, the compensation owed for hours worked is determined on a weekly basis. However, where an employee receives premium pay for each day she works over eight hours, that pay is credited toward the overtime pay requirements of Section 207(a) for hours in excess of 40 for that workweek. *See Bay Ridge Operating Co. v. Aaron*, 334 U.S. 466, 464 (1948); 29 U.S.C. § 207(e)(5); *see also* 29 C.F.R. § 778.200(a)(5); 29 C.F.R. § 778.202(a). For an employee that is paid an hourly rate, that hourly rate is the employee's regular rate. *See* 29 C.F.R. § 778.110(a).

Defendant does not contest the fact that it was and is engaged in an industry affecting commerce and was and is an "employer" within the meaning of the FLSA. Defendant further does not contest the fact that it was at all relevant times the Plaintiffs' employer. Plaintiffs do not dispute that they were paid time and half of the 12-hour rate for each hour they worked in excess of eight hours in a single day. They also do not dispute that if Defendant had paid them at their 8-hour rate and applied the Defendant's overtime formula without multiplying it by a factor of .857, Defendant would have exceeded the requirements of the FLSA. The Plaintiffs' argument is that the Defendant violated the FLSA by denying them overtime compensation at a rate not less than one and one-half times their regular rate of pay for each hour worked in excess of 40, where that "regular rate" was the posted 8-hour rate.

Defendant cites *Walling v. A. H. Belo Corp.*, 316 U.S. 624 (1942) and *White v. Witwer Grocer Co.*, 132 F.2d 108 (8th Cir. 1942), for the proposition that an employer can comply with the FLSA by reducing the "regular" wage paid to its employees and pay overtime at one and one-half

10

times the reduced regular rate such that the total pay to the employees remains the same. The Court

finds that this is a correct statement of the law and, therefore, Defendant did not violate the FLSA

by reducing the 12 hour shift wage such that the annualized wages for employees would remain the

same for 12 hour shift and 8 hour shift employees. However, Plaintiffs argue that Defendant

violated the FLSA by failing to pay overtime calculated based on the "regular rate of pay," which

they contend was the "posted" hourly rate applied to 8 hour shifts. Plaintiffs argument, however,

ignores the only relevant inquiry under Section 207(a): Whether or not Defendant properly

calculated Plaintiffs' overtime pay. Plaintiffs do not dispute that Defendant actually and in fact paid

them at a lower hourly rate than the posted rate. Furthermore, "Plaintiffs do not dispute that they

were paid time and a half of the [lower 12 hour shift rate] for each hour work [sic] in excess of 8

hours in a single day."[7] The parties therefore do not dispute the calculation Defendant employed,

but which rate qualifies as the "regular rate" under 29 C.F.R. § 778.110(a). Defendant contends that

the "regular rate" has been judicially defined as the hourly rate "actually paid" to an employee. See

*York v. City of Wichita Falls, Tex.*, 48 F.3d 919, 921 (5th Cir. 1995) (holding that "[a]n employee's

regular rate of pay is 'the hourly rate actually paid the employee for the normal, non-overtime

workweek for which he is employed.'" (quoting *Walling v. Youngerman-Reynolds Hardwood Co.*,

325 U.S. 419, 425 (1945))); *United States v. Rosenwasser*, 323 U.S. 360, 363-64 (1945) (holding

that "Section 7(a) refers to 'regular rate' which we have defined to mean 'the hourly rate actually

paid for the normal, non-overtime workweek.'" (quoting *Walling v. Helmerich & Payne, Inc.*, 323

U.S. 37, 40 (1944))).          Because Plaintiffs' do not dispute that they were actually being paid

at the lower 12 hour shift rate, this rate is the "regular rate" for purposes of calculating Plaintiffs'

overtime pay under the FLSA. Therefore, the Court finds that Defendant complied with the

overtime calculation provision of the FLSA as a matter of law. Plaintiffs objection to the regular

rate applied to this calculation is really an issue of damages. If Plaintiffs prevail on their breach of

---

[7] *Plaintiffs' Response*, p.26.

11

contract claim and establish that their proper regular rate was the posted 8 hour shift rate as opposed to the lower 12 hour shift rate, then they will be entitled to backpay that will include recalculation of overtime under FLSA § 7(a).  However, the FLSA does not provide an additional vehicle for recovery under the undisputed facts of this case.  As the Fifth Circuit has plainly stated, "[e]ven assuming some form of breach of contract by [Defendant], that is *not* equivalent to a FLSA violation. *Hartsell v. Dr. Pepper Bottling Co. of Texas*, 207 F.3d 269, 274 (5th Cir 2000) (emphasis in original).  Thus, the Court finds that summary judgment in favor of Defendant is appropriate as to Plaintiffs' FLSA overtime claim.

### III.     FLSA Retaliation Claim

It is a violation of the FLSA to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."  29 U.S.C. § 215(a)(3).  Retaliation claims under the FLSA are subject to the *McDonnell Douglas* analytical framework.  *See Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 577 (5th Cir. 2004); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  Thus, in order to prove a retaliation claim under the FLSA, a plaintiff must establish: (1) that she engaged in a protected activity; (2) she was subjected to an adverse employment action following her protected activity; and (3) there was a causal connection between the activity and the adverse action."  *James v. MedicalControl, Inc.*, 29 F. Supp.2d 749, 752 N.D. Tex. 1998 (citing *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 554 (5th Cir. 1997) (applying the standard in a Title VII case)).

Defendant does not dispute that Plaintiffs engaged in protected activity when they filed the instant lawsuit on May 15, 2003.  However, the parties disagree about whether Plaintiffs suffered an adverse employment action.  The Fifth Circuit has interpreted the "adverse employment action" element in a stricter sense than other circuits. *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999).  In the Fifth Circuit, only an "ultimate employment decision" by an employer

12

can form the basis for liability for retaliation. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir. 1997) (within the context of Title VII).

In Plaintiffs' Second Amended Complaint, they contend that since filing their lawsuit, Defendant, through one of its employees, has subjected them to harassment and threats of termination and that the Defendant has refused to stop this harassment and selective treatment.[8] However, even if the Court accepts Plaintiffs' characterization of these actions, none amount to an "ultimate employment decision" as required by the Fifth Circuit. Specifically, the Fifth Circuit has held that activities that do *not* constitute an "ultimate employment decision" include reprimands, *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642, 657-58 (5th Cir. 2002), rude treatment, *Cardiothoracic Surgery Assocs. of N. Tex.*, 139 F.3d 532, 540 (5th Cir. 1997), criticism of work and conduct, *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir. 1997), threats of potential dismissal, verbal reprimands, or low evaluations, *Mattern*, 104 F.3d at 708.[9] The facts alleged by Plaintiffs do not constitute an "ultimate employment decision."

In an apparent effort to salvage her retaliation claim, Conner alleges for the first time in her response to Defendant's motion for summary judgment that she was constructively discharged by the Defendant. No constructive discharge claim is brought on behalf of Tucker. When an employee resigns, as Conner did, she may satisfy the adverse employment action/"ultimate employment decision" requirement by proving constructive discharge. "To show constructive discharge, an

---

[8] *See* Pls.' 2nd Am. Compl.¶ 19.

[9] Plaintiffs contend in their response that the Supreme Court effectively overruled some of the above-discussed Fifth Circuit precedent in *Robinson v. Shell Oil*, 519 U.S. 337 (1997). The Court disagrees. Robinson's claim was based on a retaliatory negative reference provided by a former employer that may have caused Robinson not to receive a job offer. *Robinson* had nothing to do whatsoever with coworker harassment and whether such harassment would support a claim for retaliation. Moreover, the Court has no reason to believe that the Fifth Circuit would not consider an action that prevented an employee from obtaining subsequent employment an "ultimate employment decision," nor does the Court have reason to believe that the *Robinson* decision has changed the well-settled Fifth Circuit analysis. In fact, *Green v. Administrators of Tulane University Education Fund* was written in 2002, five years after the *Robinson* decision.

employee must offer evidence that the employer made the employee's working conditions so intolerable that a reasonable employee would feel compelled to resign." *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994) (in the Title VII context). The Fifth Circuit has held that "whether a reasonable employee would feel compelled to resign depends on the facts of each case." The following factors, singly or in combination, however, are considered relevant to the determination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Id.* A constructive discharge claim requires a "greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

Under the heading labeled "Constructive Discharge" in Plaintiffs' response to Defendant's motion for summary judgment, Conner refers the Court to no facts indicating how she was constructively discharged. The Court will proceed on the presumption that Conner's claims are again based on the actions and statements of Defendant's employee Sylvia Martinez ("Martinez"). Conner asserts that Martinez overly scrutinized her work and counted errors against her. She alleges that the Defendant's solution was simply to stop posting error counts, which made it even harder for her to keep track of the "continuing" disparate treatment. Conner also contends that Martinez told another employee that she hated Conner and would do anything to "get rid of her." She further contends that the Defendant did not do anything to remedy these actions. Even accepting these alleged facts as true, they are not enough to satisfy the stringent burden of proving a claim for constructive discharge. There is simply no evidence before the Court that Martinez's conduct was so intolerable that a reasonable employee would feel compelled to resign. Therefore, Conner is unable to establish a genuine issue of material fact on the discharge element of her prima facie case.

14

In sum, Plaintiffs failed to establish that they suffered a recognized adverse employment action.  Accordingly, Plaintiffs have not established their prima facie case of retaliation and, consequently, the Court finds that summary judgment is appropriate as to Plaintiffs' retaliation claim.

**IV.      Tucker's Claim for Intentional Infliction of Emotional Distress**

Finally, Defendant moves for summary judgment on Tucker's claim for intentional infliction of emotional distress ("IIED").  Under Texas law, intentional infliction of emotional distress requires proof (1) that the defendant acted intentionally or recklessly, (2) that the defendant's conduct was extreme and outrageous, (3) that the defendant's actions caused the plaintiff emotional distress, and (4) that the emotional distress suffered by the plaintiff was severe.  *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 611 (Tex. 1999).  Whether a defendant's conduct is so extreme and outrageous in character as to permit recovery is a question of law for the court to decide.  *See id.* at 616.

To be extreme and outrageous, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993).  The Fifth Circuit has held that when an intentional infliction of emotional distress claim is made, "[l]iability does not extend to mere insults, indignities, threats, annoyances, or petty oppressions."  *Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir. 1993); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 606 (Tex. 2002) (conduct that is merely insensitive or rude is not extreme and outrageous conduct).

A claim for intentional infliction of emotional distress does not lie for ordinary employment disputes.  *See City of Midland v. O'Bryant*, 18 S.W.3d 209, 217 (Tex. 2000).  Even if an employer discriminates on the basis of age or disability, the employer's conduct becomes "extreme and outrageous" only in the "most unusual cases."  *See Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996) ("An employer's conduct, even if a Title VII violation, rises to the level of

'extreme and outrageous' in only 'the most unusual cases.'") (citations omitted); *Walker v. Thompson*, 214 F.3d 615, 628 (5th Cir. 2000) ("although the appellee's racial harassment of the appellants may have been illegal . . ., it does not rise to the level of extreme and outrageous conduct under Texas law.").

Tucker argues that she suffered severe emotional distress because of the actions of two of her fellow employees, Martinez and David Garcia ("Garcia"). She alleges that Martinez would draw attention to mistakes in her lab reporting and charge her with reporting errors, would leave notes threatening termination, and would not provide adequate training. With respect to Garcia, Tucker testified that he gave her a negative performance review, incorrectly questioned her regarding her timecard entries, and threatened corrective action under the mistaken impression that she had not timely completed her self-appraisal. Tucker argues that the Defendant's intentional act of failing to stop the continued harassment amounted to extreme and outrageous behavior. The Court cannot agree. The facts alleged do not amount to extreme and outrageous behavior. Tucker has not raised sufficient evidence to create a genuine issue of material fact as to the second element of her IIED claim. Accordingly, Defendant is entitled to summary judgment on that claim.

### Conclusion

For the reasons explained above, the Court GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment (Dkt. #63).

It is so ORDERED.

Signed this 31st day of March, 2006.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE

16